STATE of Missouri, Respondent,

v.

Scott A. McLAUGHLIN, Appellant.

No. SC 88181.

Supreme Court of Missouri,
En Banc.

Aug. 26, 2008.

Rehearing Denied Sept. 30, 2008.

Deborah B. Wafer, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Shaun J. Mackelprang, Asst. Attys. Gen., Jefferson City, for Respondent.

LAURA DENVIR STITH, Judge.

Scott A. McLaughlin was tried and found guilty of first-degree murder. Because the jury deadlocked on the final step of the punishment phase, the question of punishment went to the trial judge, who imposed a sentence of death. Mr. McLaughlin argues that section 565.030.4 prohibited the judge from imposing any sentence but life imprisonment once the jury was unable to agree upon a punishment. He further argues it was error to instruct the jurors that they were required to unanimously agree that mitigating evidence outweighed that in aggravation in order to be required to recommend a life sentence in their response to the second

special interrogatory submitted to them in the penalty phase.

In addition, Mr. McLaughlin argues that the trial court erred in finding there was sufficient evidence to support a submission that he forcibly raped the victim, in failing to submit a felony murder instruction, in admitting evidence of prior statements by the victim about his harassing and stalking her and about the protection provided to her by the police and certain victim impact evidence, in failing to *sua sponte* prohibit certain closing argument and in rejecting certain jury instructions.

For the reasons set forth below, this Court finds no reversible error in any of the above points, finds that the sentence is proportionate to the crime as required under section 565.035.3, RSMo 2000, and affirms the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence at trial, considered in the light most favorable to the jury's verdict, shows that Scott McLaughlin and Beverly Guenther began a tempestuous relationship shortly after they met in 2002. For several months, the two lived together, but their cohabitation was marked by breakups that were sometimes so serious that Ms. Guenther would obtain a restraining order against Mr. McLaughlin. In the spring of 2003, they ended their amorous relationship, but continued to see each other on social occasions. Throughout their relationship, Mr. McLaughlin frequently called and visited Ms. Guenther at her place of employment.

On October 27, 2003, Mr. McLaughlin was arrested and charged with burglarizing Ms. Guenther's home. He claimed that he was reclaiming things that he left at her house after they stopped living together. He was arraigned on the burglary charge on November 18, 2003.[1] Based on this incident, Ms. Guenther sought and received an order of protection against Mr. McLaughlin. On November 20, 2003, while the protective order was still in effect, he drove to Ms. Guenther's place of employment and waited for her to get off of work. When she emerged from the office, he spoke with her as she walked towards her truck.

The state presented expert testimony that the blood spatters and other physical evidence in the parking lot and truck suggested that Mr. McLaughlin at that point forced Ms. Guenther to the ground and raped her, then stabbed her repeatedly, causing a fan-shaped blood stain on the parking lot, and then dragged her body to his car and placed it in the hatchback. Mr. McLaughlin then drove to the river with the intention of disposing of her body. He tried to deposit her body in the river, but ran into some thick underbrush along the bank and left her corpse there. He then returned to sleep in his parked car because one of the tires had become flat when he stopped to dispose of the body.

The next day, Mr. McLaughlin cleaned out the inside of his car with bleach. As the day went on, he became increasingly hyperactive and nervous. Eventually, Mr. McLaughlin asked a friend to take him to a hospital in St. Charles so that he could get some medication for his mental disorder. The police were informed that Mr. McLaughlin was going to be at the hospital, and he was arrested when he arrived.

Mr. McLaughlin was charged with first-degree murder, forcible rape, and two counts of armed criminal action (one based

---

1. Mr. McLaughlin eventually was found guilty by a jury of this charge and received a seven year sentence.

on the murder, the other based on the rape). After admission of all the evidence in the guilt phase, Mr. McLaughlin moved for a judgment of acquittal on the forcible rape charge on the ground that there was no evidence that he had sex with Ms. Guenther while she was alive. The trial court overruled the motion, stating that even if the sexual intercourse occurred at the riverbank after Ms. Guenther was dead, "it's still a part of the continuous series of events that's part of the rape." On the basis of these rulings, Mr. McLaughlin requested that the trial court submit a felony murder instruction to the jury. The court refused, but did submit conventional second-degree murder.

The jury found Mr. McLaughlin guilty of first-degree murder, forcible rape, and armed criminal action based on the first-degree murder allegations. Mr. McLaughlin was acquitted of the armed criminal action charge related to the rape conviction.

At the sentencing phase, the jury heard testimony from Ms. Guenther's surviving relatives about her life and the impact of her murder upon their own lives. The jury also heard fairly extensive testimony regarding Mr. McLaughlin's abusive childhood. Mr. McLaughlin's mother was a prostitute and his father was an alcoholic. His early childhood was marked with abuse and neglect, and he bounced among foster homes until he was placed with his eventual adoptive parents, the McLaughlins, at the age of 5. The McLaughlins also took custody of his younger brother and sister. Mr. McLaughlin continued to suffer abuse at the hands of his adoptive parents. His adoptive father was a police officer and, in addition to paddling the children with a "board of education," would use his taser and nightstick on him. The McLaughlins would also lock the cabinets so the children could not eat. Scott and his childhood friends referred to his house as "the house of horrors."

The jury also heard testimony that Mr. McLaughlin's psychological problems began manifesting themselves when he was a young boy. When Scott was nine years old, he was subjected to extensive intelligence testing because of recurring poor performance and peculiar behavior at school. The testing showed a full scale IQ of 82, which is in the low average range, and resulted in diagnoses of attention deficit hyperactivity disorder, mild neurological brain damage, learning disabilities, and "adjustment reaction of childhood with depressive features." An elementary school counselor who evaluated Scott at the age of eight wrote, "I would evaluate Scott's psychological problems as being extremely serious. I have worked as an elementary school counselor for nine years in three different schools and had to deal with some very serious cases. Scott's is the most serious of all." During the penalty phase, Mr. McLaughlin also sought to show that his brother helped him dispose of the body, but the trial court rejected this testimony.

After hearing all the evidence, the jury found in step one of its penalty phase deliberations that the statutory aggravating factor of depravity of mind had been proven beyond a reasonable doubt. In step two, the jurors were unable to unanimously conclude that the factors in mitigation outweighed those in aggravation. They went on to step three, therefore, which directed them to determine whether, under all the circumstances, death was warranted. The jurors were unable to agree on punishment. Under section 545.030, if the jurors are unable to agree unanimously at this step in their deliberations, then the question of punishment goes to the trial court. The trial court considered all of the evidence, including

the aggravating factor found by the jury, and sentenced Mr. McLaughlin to death. He appeals his conviction and death sentence.

## II. STANDARD OF REVIEW

 The evidence is reviewed in the light most favorable to the verdict. *State v. Strong,* 142 S.W.3d 702, 710 (Mo. banc 2004). The trial court is vested with broad discretion in determining the admissibility of evidence offered at the guilt and penalty phases of a capital case. *State v. Storey,* 40 S.W.3d 898, 903 (Mo. banc 2001); *State v. Middleton,* 995 S.W.2d 443, 452 (Mo. banc 1999). This Court's direct appeal review is for prejudice, not mere error, and the trial court's decision will be reversed only if the error was sufficiently prejudicial that it deprived the defendant of a fair trial. *Id.* Any issue that was not preserved can only be reviewed for plain error, which requires a finding that manifest injustice or miscarriage of justice has resulted from the trial court error. *State v. Glass,* 136 S.W.3d 496, 507 (Mo. banc 2004).

In addition, in reviewing the jury's decision to impose a death sentence, section 565.035.3 requires this Court to undertake a proportionality review to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; and (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering

both the crime, the strength of the evidence, and the defendant.

## III. DISCUSSION

*A. The Trial Court May Impose a Sentence of Death When the Jury Deadlocks on the Final Step of Section 565.030.4.*

██ Mr. McLaughlin argues that section 565.030.4 is unconstitutional to the extent that it requires the judge to make the findings of fact necessary to make a defendant eligible for a sentence of death if, as occurred here, the jury is unable to agree on punishment in the final step of the deliberative process. In support, he cites to *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that "[c]apital defendants, no less than noncapital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring,* 536 U.S. at 589, 122 S.Ct. 2428.

As Mr. McLaughlin notes, in *State v. Whitfield,* 107 S.W.3d 253, 258 (Mo. banc 2003), this Court applied the principles of *Ring* to section 565.030. *Whitfield* noted that in this section the legislature conditioned an increase in punishment from life imprisonment to death on the jury following a four-step process (since reduced to three steps),[2] all but the last step of which required the jury to make specific factual findings. *Id.* As the statute required the jury to find all three of the facts submitted in steps one through three in order to impose a death sentence, the failure of the jury to find one of these three facts required entry of a life sentence. *Id.* at 260–64.

**2.** After Mr. Whitfield was tried, section 565.030.4 was revised to delete what had been the second finding the jury was required to make concerning the presence of additional non-statutory aggravators. *Compare* sec. 565.030.4, RSMo 1993; *with* sec. 565.030.4, RSMo Supp. 2001.

The final step did not require the jury to make a finding in order to make the defendant eligible for death, but rather told the jury that even if it found the first three steps against the defendant, it could decide under all of the circumstances not to assess and declare the punishment at death. Therefore, if the jury became deadlocked on that last step, *Ring* did not prohibit the judge, as trier, from deciding the final step as required by section 565.030.4. *Id.* at 264, 270. The *Whitfield* jury was deadlocked, and the trial judge, as required by section 565.030.4, went through all four steps and then imposed a sentence of death. Because this Court could not determine at what point the jury deadlocked, since no specific jury interrogatories were submitted, this Court reversed the death sentence the trial judge had imposed in that case and remanded for entry of a life sentence. *Id.* at 269–272.

As Mr. McLaughlin notes, since *Whitfield*, the legislature has removed the requirement that the trier separately find that the aggravating circumstances warrant death and has added a requirement that the jury find that defendant is not mentally retarded if that issue is contested (an issue not contested or submitted here). The legislature has not, however, changed the portion of section 565.030.4 that provides that the judge shall follow the same procedure the jury follows if the jury is unable to reach a verdict on punishment. The current version of section 565.030.4 states in relevant part:

> If the trier at the first stage of a trial where the death penalty was not waived finds the defendant guilty of murder in the first degree, a second stage of the trial shall proceed at which the only issue shall be the punishment to be assessed and declared. Evidence in aggravation and mitigation of punishment, including but not limited to evidence supporting any of the aggravating or mitigating circumstances listed in subsection 2 or 3 of section 565.032, may be presented subject to the rules of evidence at criminal trials.
>
> . . . .
>
> The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:
>
> (1) If the trier finds by a preponderance of the evidence that the defendant is mentally retarded; or
>
> (2) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or
>
> (3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or
>
> (4) If the trier decides under all of the circumstances not to assess and declare the punishment at death. If the trier is a jury it shall be so instructed.
>
> If the trier assesses and declares the punishment at death it shall, in its findings or verdict, set out in writing the aggravating circumstance or circumstances listed in subsection 2 of section 565.032 which it found beyond a reasonable doubt. If the trier is a jury it shall be instructed before the case is submitted that if it is unable to decide or agree upon the punishment the court shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor or death. *The court shall follow the same procedure as set out in this*

*section whenever it is required to determine punishment for murder in the first degree.*

Sec. 565.030.4, RSMo 2007 (emphasis added). Mr. McLaughlin argues this procedure violates *Whitfield* and requires reversal and remand for entry of a life sentence in any case, including this one, in which the jury deadlocks.

Mr. McLaughlin is incorrect. As the above discussion notes, *Whitfield* does not state that a judge cannot enter a death sentence if the jury deadlocks; it says, rather, that under the principles set out in *Ring,* the jury must make the required factual findings that increase the punishment from a life sentence to death. *Whitfield,* 107 S.W.3d at 261–62.

Since *Whitfield,* Missouri's instructions in capital cases have been revised to require the jurors to answer special interrogatories indicating whether they found a statutory aggravating factor to be present, and if so, what factor, and whether they found that mitigating evidence did not outweigh aggravating evidence. *See* MAI–CR 3d 314.40, 314.58. The jury in this case followed its instructions and answered that it did find the statutory aggravator that the crime was committed with depravity of mind in that Mr. McLaughlin committed repeated and excessive acts of physical abuse. It also specifically found that it could not unanimously conclude that the evidence in mitigation outweighed the evidence in aggravation of punishment. Its answers thus show that it became deadlocked only after making the necessary factual findings. *Whitfield* did not hold that a judge could not consider the facts and make a determination whether to impose death once a jury had found the

facts necessary to make a defendant eligible for a death sentence under section 565.030.4, and such a procedure does not violate *Ring.* The judge below did not err in reconsidering the facts and determining that under all of the circumstances death should be imposed.

Mr. McLaughlin also argues that the trial judge actually went beyond the jury's findings that he acted with depravity by committing repeated and excessive acts of physical abuse, because the judge also said that these acts "encompassed beating, stabbing and sexual intercourse on a continuous basis." Mr. McLaughlin argues that the finding of "sexual intercourse on a continuous basis" is inconsistent with the jury's failure to find that the murder was committed while he was perpetrating the forcible rape, and its rejection of the charge of armed criminal action in regard to the rape.[3]

This Court again disagrees. While the jury did reject two aggravating factors, it did find Mr. McLaughlin forcibly raped the victim. The court's finding of sexual intercourse on a continuous basis, therefore, was not inconsistent with the jury's verdict.

*B. Alleged Errors in Penalty–Phase Jury Instructions*

## 1. Whether Evidence as a Whole Justifies a Sentence of Death or Life Imprisonment

■ Mr. McLaughlin requested an instruction not included in MAI–CR, which would have directed the jury to determine "whether the evidence as a whole justifies" imprisonment for life or a sentence of death. The trial court did not err in refusing this offered instruction. While Mr.

---

3. The reference to "on a continuous basis" concerns whether the rape was part of a continuous series of acts that constituted forcible compulsion even if the victim was deceased before the culmination of the rape, as discussed *infra,* rather than some separate finding as to the nature of the rape itself, and is not inconsistent with the jury's findings.

McLaughlin is correct that section 565.032.1(2) provides that the judge shall instruct the jury to consider whether a statutory aggravating circumstance has been proved beyond a reasonable doubt and, if so, "whether the evidence as a whole justifies a sentence of death or a sentence of life imprisonment, ..." it is well-settled that instructions to the jury need not use the exact language of statutes. *See United States v. Claxton*, 276 F.3d 420, 423 (8th Cir.2002) ("[a defendant] is not entitled to a particularly worded instruction"); *State v. Newlon*, 627 S.W.2d 606, 614 (Mo. banc 1982), *overruled on other grounds, State v. Carson*, 941 S.W.2d 518 (Mo. banc 1997) (while instruction in death penalty case "does not utilize the precise statutory words, it nevertheless employs terms which have been determined as proper substitutes by our courts"). Statutes are intended to set out the law; instructions are intended to provide the jury with directions as to how to determine the facts under that law.

In accordance with MAI–CR 3d 314.44, Instruction 24 specifically told the jury that if it found a statutory aggravator:

> you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment.
>
> In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial ...

Instruction 25 further instructed the jury:

> You are not compelled to fix death as the punishment even if you do not find the existence of facts and circumstances in mitigation of punishment sufficient to outweigh the facts and circumstances in aggravation of punishment. You must consider all the evidence in deciding

whether to assess and declare the punishment at death.

Instruction 26 again instructed the jury it must consider "all of the evidence" in deciding punishment and that it is the primary duty of the jury to fix punishment.

These instructions adequately informed the jury that it is up to it to determine whether the evidence as a whole justifies life or death. Further, Mr. McLaughlin's suggestion that section 565.032.1(2) sets out an additional element that must be the subject of a separate, special finding in order to make defendant death-eligible is not supported by the statutory language. The statutes nowhere state such a finding is required in order to impose a death sentence; the legislature set out the required findings in section 565.030, not section 565.032.1.

### 2. Requirement of Unanimous Decision that Mitigating Evidence Outweighs Aggravating Evidence

Finally, although not set out in his Points Relied On, or objected to at trial, in the body of his argument Mr. McLaughlin asserts that the trial court erred in instructing the jury that it was required to *unanimously* agree that the evidence in mitigation outweighed the evidence in aggravation in order to be required to return a life sentence at step two of the procedure set out in the current version of section 565.030.4. He notes section 565.030 does not mention how many jurors must agree on any proposition, but merely says "if the trier concludes that there is evidence in mitigation of punishment that is sufficient to outweigh the evidence in aggravation of punishment found by the trier," then it shall impose a life sentence.

A logical reading of the phrase "if the trier concludes," Mr. McLaughlin argues, is that it requires a majority of jurors to conclude that facts in mitigation outweigh those in aggravation; if a majority so

finds, he contends, then "the trier"—that is, the jury—has so found. Therefore, he argues, Missouri's jury instructions are in error in requiring the jury to unanimously find that evidence in mitigation outweighs evidence in aggravation in order to be required to impose a life sentence in this step under the statute. The Court reviews this point for plain error. Rule 30.20.

Mr. McLaughlin cites no authority, and none is found, that the United States or Missouri constitutions bar instructing the jury that in order to return a sentence of life imprisonment at this particular step it must unanimously find that mitigating evidence outweighs aggravating evidence. To the contrary, while *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), hold that it is improper to require jurors to be unanimous in their conclusion that a particular mitigating factor is present, they did not disapprove of state statutes that require the jurors to all agree that whatever mitigating factors they do find outweigh the aggravating factors.

Missouri's instructions do clearly tell the jury, "[i]t is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment." MAI CR3d 314.44. They elsewhere properly permit jurors, in the final step of their penalty phase deliberations, to vote for life imprisonment rather than death even though they did not find unanimously that factors in mitigation outweighed those in aggravation. MAI–CR3d 314.46. There is no error of constitutional proportions in these instructions.

The question, thus, becomes one of statutory interpretation. Mr. McLaughlin concedes that *State v. Zink,* 181 S.W.3d 66, 74 (Mo. banc 2005), rejected an identical argument concerning whether section 565.030.4 requires unanimous findings, and neither party has identified any other Missouri cases addressing this issue. This Court's independent review of a cross-section of cases in other jurisdictions that also have statutes requiring a jury to consider whether mitigating evidence outweighs aggravating evidence has not revealed any instance in which a statute has been interpreted to mean that a life sentence must be returned if there is a majority rather than unanimous vote that mitigating evidence exceeds that in aggravation, except where the statute explicitly so requires.[4] To the contrary, in the one case to address an equivalent issue, *People v. Colon,* 272 Conn. 106, 864 A.2d 666 (2004), Connecticut jury instructions required unanimity under a statute that, similarly to Missouri's, simply says that "the jury" must find mitigating evidence outweighs that in aggravation.[5] In approving that portion of

---

**4.** A few statutes do specifically provide for a decision by majority rule. *See, e.g., Waldrop v. State,* 859 So.2d 1138, 1172 (Ala.Crim.App. 2001) (noting under Alabama statutes "unanimity is not required in the penalty phase. Ten votes are required in order to recommend death. At least seven votes are required in order to recommend life without parole"); Fla. Stat. Sec. 921.141.(3) (notes that the judge imposes final sentence after receiving an advisory sentence recommendation from "a majority of the jury").

**5.** Connecticut General Statutes section 53a–46a(g) stated:

If the jury ... finds that ... one or more of the aggravating factors ... exist and one or more of the mitigating factors exist, but the one or more aggravating factors ... do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release.

The jury instruction approved in *Colon,* 864 A.2d at 816, stated:

If your deliberations result in [a] unanimous agreement that the aggravating factor

the instruction, the Connecticut Supreme Court stated, "it is no longer necessary for the jury unanimously to agree on whether a mitigating factor or factors exist, but the jurors must unanimously agree on whether the aggravating factor or factors outweigh the mitigating factor or factors." *Id.* at 813 (footnote omitted).

In the absence of guiding case or other authority, the language of the statute itself provides the best guide. This Court has recently held:

'The primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning.' *In re Boland*, 155 S.W.3d 65, 67 (Mo. banc 2005). In determining the intent and meaning of statutory language, 'the words must be considered in context and sections of the statutes in pari materia, as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words.' *State ex rel. Wright v. Carter*, 319 S.W.2d 596, 600 (Mo. banc 1959). 'The provisions of a legislative act are not read in isolation but construed together, and if reasonably possible, the provisions will be harmonized with each other.' *Bachtel v. Miller County Nursing Home Dist.*, 110 S.W.3d 799, 801 (Mo. banc 2003).

*State ex rel. Evans v. Brown Builders Elec. Co., Inc.*, 254 S.W.3d 31, 35 (Mo. banc 2008). Applying these principles here, section 565.030.4 states in relevant part:

(1) If the trier finds by a preponderance of the evidence that the defendant is mentally retarded; or

(2) If the trier does not find beyond a reasonable doubt at least one of the

does not outweigh any mitigating factor or factors, you would indicate that on the verdict sheet.... Upon that finding, the court

statutory aggravating circumstances set out in subsection 2 of section 565.032; or

(3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or

(4) If the trier decides under all of the circumstances not to assess and declare the punishment at death. If the trier is a jury it shall be so instructed.

Sec. 565.430.4. Each of these subdivisions uses identical language requiring "the trier" to find, or not to find, that the defendant is mentally retarded, or that there is a statutory aggravating circumstance, or that the evidence in mitigation is sufficient to outweigh that in aggravation, or that under all the circumstances a punishment of death shall not be imposed. Thus, if the legislature intended a majority vote to fulfill the requirement that "the trier concludes" that mitigating evidence outweighs aggravating evidence, then it must also have intended a majority vote to be sufficient under the other three subdivisions of that section.

Clearly, however, that cannot be the case. Subdivision (2), for instance, requires the trier to find a statutory aggravating circumstance. *Ring* requires that all facts necessary to increase punishment must be found by the jury. If a majority vote that a statutory aggravator was present were sufficient, the statute would be in conflict with this requirement. *See also Whitfield*, 107 S.W.3d at 257–259.

will impose a sentence of life imprisonment without the possibility of parole.

Similarly, under subdivision (4), if a majority vote were sufficient to constitute "the trier" deciding under all the circumstances not to assess punishment at death, then only those instances in which less than a majority reached that decision would be a hung jury. Yet, the remainder of section 565.030.4 treats all instances in which the jury cannot unanimously agree on punishment in this final step in the same way: the jury is considered deadlocked and the question of punishment is left to the judge.

For these reasons, this Court reaffirms its holding in *Zink* that under section 565.030.4(2), the jury must unanimously decide that the mitigating evidence outweighs the aggravating evidence in order to be required to return a life sentence. There was no plain error in submitting this instruction.

*C. Whether Forcible Rape Must Be Completed While the Victim is Still Alive*

Missouri's forcible rape statute, like that of most jurisdictions, does not expressly address whether the victim must be alive at the time of penetration. It simply states that a "person commits the crime of forcible rape if such person has sexual intercourse with another person by the use of forcible compulsion.…" Sec. 566.030(1). Mr. McLaughlin argued to the trial court that one cannot act with forcible compulsion against a person who is already dead; therefore, in order to prove the "forcible compulsion" element of forcible rape, the state must show beyond a reasonable doubt that the victim was alive at the culmination of the rape.

Because Mr. McLaughlin claimed (contrary to the state's evidence based on the blood stains in the parking lot) that he had raped the victim after he stabbed her to death, he argued that the court should have directed a verdict in his favor on the rape count, as his crime at most constituted necrophilia or desecration of a corpse. Alternatively, he argued that the court should have instructed the jury that if it had reasonable doubt that the victim was alive when Mr. McLaughlin had sexual intercourse with her, it must find him not guilty of forcible rape.

The trial court rejected Mr. McLaughlin's arguments, stating, "I don't know that she actually has to be alive at the actual time—time of the sexual penetration. When it says forcible compulsion, that is all part of rape. So if a man, in the process of raping a woman, is killing her, that's the forcible compulsion." It then ruled that even if the actual assault occurred later, after Ms. Guenther was dead, it began with the stabbing so "it's still a part of the continuous series of events that's part of the rape." On appeal, Mr. McLaughlin claims this was reversible error. This Court disagrees.

As have the majority of jurisdictions to address this issue,[6] this Court adopts the "ongoing criminal assault" rule. Under that rule, where the forcible compulsion that leads to the rape begins before the death of the victim, the defendant is guilty of rape even if the jury believes defendant killed the victim before penetration or before the sexual assault was concluded. As the Tennessee Supreme Court noted in

**6.** *See e.g., Smith v. Com.,* 722 S.W.2d 892 (Ky.1987); *Lipham v. State,* 257 Ga. 808, 364 S.E.2d 840 (1988); *State v. Brobeck,* 751 S.W.2d 828 (Tenn.1988); *State v. Honie,* 57 P.3d 977 (Utah, 2002); *Lewis v. State,* 889 So.2d 623 (Ala.Crim.App.2003); *State v. La-Tourelle,* 343 N.W.2d 277 (Minn.1984); *State v. Jones,* 308 N.J.Super. 174, 705 A.2d 805 (1998); *Com. v. Waters,* 420 Mass. 276, 649 N.E.2d 724 (1995); *State v. Collins,* 66 Ohio App.3d 438, 585 N.E.2d 532, 536 (1990); and *State v. Gallegos,* 178 Ariz. 1, 870 P.2d 1097, 1105 (1994).

adopting the majority rule, there are important policy reasons why the death of the victim during the assault should not preclude a conviction of rape:

> We are likewise unable to embrace the notion that the fortuitous circumstance, for the rapist, that death may have preceded penetration by an instant, negates commission of the crime of aggravated rape and reduces it to a relatively minor offense associated with erotic attraction to dead bodies. *Reading the "live only" requirement into the statute encourages rapists to kill their victims*, in our opinion.

*State v. Brobeck*, 751 S.W.2d 828, 832 (Tenn.1988) (emphasis added).

The Georgia Supreme Court similarly reasoned that the perpetrator should not be effectively rewarded for using force sufficient to cause death, stating:

> If the element of force is satisfied where the defendant has used less than deadly force to overcome the victim's resistance so as to allow him to have carnal knowledge of the victim, the element of force is surely no less satisfied when the defendant has used deadly force to accomplish his aim.

*Lipham v. State*, 257 Ga. 808, 364 S.E.2d 840, 842 (1988).

*Lipham* analogized to when an armed robber first kills his victim and then takes his money. Even though the victim is dead when the robbery is consummated, and thereafter can no longer be "forced" to do anything, it is still armed robbery because the theft continues and is able to be accomplished due to the deadly earlier force. *Id.* (citation omitted). So, too, in a forcible rape prosecution, where defendant

has rendered the victim "permanently unconscious" as a part of a course of continuous conduct that resulted in the rape, the state has met its burden of proving forcible compulsion. *Id.*

The Utah Supreme Court similarly recognized that the single, continuous assault rule provides the appropriate standard where the defendant killed the victim after beginning the forcible compulsion that led to the rape. As the concurring opinion stated:

> I find it difficult to believe that the legislature, in enacting the corpse desecration statute, intended it to apply, to the exclusion of other statutes relating to sexual assault, in cases where a defendant's single, continuous assault on a victim results in the victim's death and in sexual contact.

*State v. Honie*, 57 P.3d 977, 997 (Utah 2002) (Durrant, J., concurring).[7]

■ This Court agrees and adopts the majority rule that considers the entirety of a defendant's conduct from the beginning of the assault through completion of the sexual contact. It is rape where defendant both kills and sexually assaults a victim in a single, continuous act, or in a series of closely related acts, and where, as a part of the course of conduct, defendant uses forcible compulsion against the victim, even if portions of the rape, including penetration, occur once the victim already has been killed.

In so holding, this Court expressly rejects Mr. McLaughlin's request that Missouri adopt the minority "bright-line" rule that a rape victim must be alive at the

---

7. *Compare State v. LaTourelle*, 343 N.W.2d 277 (Minn.1984) (defendant convicted of first degree felony-murder where he intended to rape victim prior to the homicide, but the rape took place after the homicide) *with State*
*v. Givens*, 332 N.W.2d 187 (Minn.1983) (defendant acquitted of first-degree felony-murder where he participated in murder of victim, then returned to murder scene a short time later to rape victim).

moment of penetration.[8] These courts reason that rape must be accomplished against a person's will, and once one is dead one has no will which can be overborne. *See, e.g., People v. Sellers,* 203. Cal.App.3d 1042, 1050, 250 Cal.Rptr. 345 (Cal.App. 4 Dist.1988). While true, where the perpetrator uses force to gain control over the victim, defendant has used force to accomplish the rape just as much as if the force occurred later in the sexual contact. Perhaps that is why two of the decisions that adopted the minority rule were later effectively overruled when those states' legislatures adopted the continuous conduct rule by statute.[9]

### D. Refusal to Submit Felony Murder

█ Mr. McLaughlin next argues that the trial court erred in submitting only first-degree and conventional second-degree murder and in refusing to also submit second-degree felony murder. He notes that the state argued that he raped the victim in the same incident in which he murdered her and submitted counts of both forcible rape and first-degree murder. The jury in fact found that Mr. McLaughlin forcibly raped the victim and that he murdered her. Therefore, Mr. McLaughlin argues, the trial court should have submitted felony murder so that he could have argued that if the jury found that he killed the victim in furtherance of the rape, it should convict him of second-degree felony murder rather than first-degree murder.

█ Mr. McLaughlin is correct that a trial court is obligated to charge the jury with respect to lesser included offenses that are supported by the evidence, so as to give it a third choice beyond either acquittal or first-degree murder. *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *State v. Hall,* 982 S.W.2d 675, 682 (Mo. banc 1998); Sec. 556.046, RSMo 2000. Felony murder is a lesser-included offense of first-degree murder. Sec. 565.025.2(1)(a). Conventional second-degree murder is also a lesser-included offense of first-degree murder, however. For this reason, as Mr. McLaughlin recognizes, *Hall* held that it was not error to refuse to submit felony murder so long as the trial court did submit second-degree murder, for when "a jury convicts on first-degree murder after having been instructed on second-degree murder, there is no prejudice to the defendant by the refusal to submit a second-degree felony murder instruction." *Hall,* 982 S.W.2d at 682, (*quoting State v. Kinder,* 942 S.W.2d 313, 330 (Mo. banc 1996)).

Mr. McLaughlin acknowledges *Hall,* but argues that it is distinguishable because in that case the prosecution did not also submit the felony that underlies the felony murder charge, whereas here the prosecutor did submit both murder and forcible rape. He also argues that he should have had the option, at least, of choosing which form of second-degree murder to submit in this situation.

---

**8.** *See e.g., Doyle v. State,* 112 Nev. 879, 921 P.2d 901 (1996), *overruled on other grounds by Kaczmarek v. State,* 120 Nev. 314, 91 P.3d 16 (2004); *People v. Davis,* 10 Cal.4th 463, 41 Cal.Rptr.2d 826, 896 P.2d 119, 151 n. 20 (1995); *State v. Perkins,* 248 Kan. 760, 811 P.2d 1142 (1991); *Com. v. Sudler,* 496 Pa. 295, 436 A.2d 1376 (1981); *Rogers v. State,* 890 P.2d 959 (Okl.Cr.1995) (assuming rather than deciding that rape requires live victim); and *State v. Holt,* 128 Wis.2d 110, 382 N.W.2d 679 (Wis.Ct.App.1985). Additionally,

*People v. Hutner,* 209 Mich.App. 280, 530 N.W.2d 174 (1995), followed the minority rule, but a different panel of the Michigan Court of Appeals rejected *Hutner* and opted instead to follow the majority ongoing criminal assault rule. *People v. Diefenbach,* 1996 WL 33360429 (Mich.Ct.App.1996) (unpublished).

**9.** *See* Wis. Stat. sec. 940.225(7) and 18 Pa. C.S. sec. 3123(e).

While the prosecution in *Hall* did not submit the underlying felony, the case on which it relied, *Kinder*, did submit both first and conventional second-degree murder and rape, just as in the case at bar. Thus, it is directly on point. *Kinder* held that because the pattern criminal jury instructions require the jury to find defendant not guilty of first-degree and conventional second-degree murder before considering the felony murder instruction, no prejudice could result from failing to submit felony murder. *Kinder*, 942 S.W.2d at 330.

Of course, Mr. McLaughlin is correct that the trial court could have submitted felony-murder rather than or in addition to submitting conventional second-degree murder without committing error if both were supported by the evidence. But, the issue is not what the trial court could have done, but whether prejudice resulted from its failure to submit felony murder. *Hall*, *Kinder*, and numerous other cases hold that no prejudice results from refusing to submit a felony murder instruction where a conventional second-degree murder instruction was given because the latter sufficiently tests the evidence of deliberation by giving the jury the option of convicting the defendant of a lesser offense. *See Schad v. Arizona*, 501 U.S. 624, 647–48, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); *State v. Wise*, 879 S.W.2d 494, 517 (Mo. banc 1994), *overruled on other grounds by Joy v. Morrison*, 254 S.W.3d 885 (Mo. banc 2008). This Court reaffirms these holdings.

E. *Forfeiture by Wrongdoing Doctrine*

In the guilt phase, the trial court admitted evidence that police officers escorted the victim from her office to her car and, at her request, they followed her several miles from work until she reached the highway. In the penalty phase, the trial court admitted evidence concerning Mr. McLaughlin's harassing and threatening conduct toward the victim, including evidence of a prior incident in which he jumped out of the bushes at her as she left work, assaulted her by grabbing her left breast, and repeatedly showed up at her work, despite various protective orders that were in place. Evidence was also presented that he was charged with burglary for entering her home and taking a variety of items, some of which may have been his but some of which belonged to the victim.

Mr. McLaughlin argues that this evidence constituted improper testimonial evidence that was prohibited under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), because the victim was not present at trial to be cross-examined about these statements. Mr. McLaughlin concedes the incongruity of arguing that she had to be present to be cross-examined when the reason she was not present was that he had murdered her, particularly where, as here, he confessed to the murder and contested only his state of mind at the time of the killing. But, he argues, even in such circumstances, her unconfronted statements are excluded by the Sixth Amendment's confrontation clause.

The state urges this Court to recognize the "forfeiture by wrongdoing" exception to the confrontation clause. This equitable principle holds that "if a witness is absent by [defendant's] own wrongful procurement, [defendant] cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts." *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed. 244 (1878).

Mr. McLaughlin argues that this exception cannot apply where the purpose of keeping the witness away was not related to the present case. In other words, the exception would apply at a trial for the burglary of the victim's home and at an adult abuse trial if he killed her to keep her from testifying at that burglary trial and adult abuse trial, but here he is being tried for murder, and since he did not kill her in order to keep her from testifying at his trial for her own murder, the exception would not apply.

The parameters of the forfeiture by wrongdoing doctrine have been clarified by the United States Supreme Court since this case was submitted. *Giles v. California*, 554 U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (June 25, 2008). Under *Giles*, those parameters are not as circumscribed as defense counsel argues, at least in the context of cases involving domestic violence. In *Giles*, the trial court allowed into evidence statements made by a murder victim to a police officer responding to a domestic violence call. *Crawford* was decided while the case was on appeal in the California courts. Those courts held that the forfeiture by wrongdoing doctrine provided an exception to *Crawford* that applied even if defendant did not engage in the wrongdoing (in that case, murder) to prevent the victim from testifying. The United States Supreme Court agreed that the forfeiture by wrongdoing doctrine constitutes an exception to the Confrontation Clause, but also held that for it to apply, the state must show that the defendant engaged in the wrongdoing with the intent to prevent the witness from testifying. *Giles*, 128 S.Ct. at 2683–2687.

This holding does not aid Mr. McLaughlin, however, for *Giles* went on to specifically discuss the application of the doctrine to cases of domestic violence in which the defendant has allegedly murdered the victim. In so doing, it indicated that past acts of violence resulting in murder may be admissible because:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. *Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.*

*Id.* at 2693 (emphasis added). These principles are directly applicable to the present case. The trial court below specifically stated:

> The Court further finds—and the Court takes all the findings and finds by clear and convincing evidence that the defendant intended to make Ms. Guenther unavailable as a witness, both in the burglary and in the abuse cases, to be a witness against him. He was charged and also did the murder to procure her unavailability as a witness.

In these circumstances, the trial court having found that Mr. McLaughlin's intent was to procure the victim's unavailability as a witness, evidence of her statements about Mr. McLaughlin's attacks on her and comments to her comes squarely within the type of evidence *Giles* states is admissible under the forfeiture by wrong-

doing doctrine.[10]

*F. Penalty Phase Errors in Admitting Evidence*

### 1. Victim Impact Evidence

Mr. McLaughlin recognizes that "victim impact" evidence is admissible in the penalty phase of the trial under *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), but asserts that the court went beyond permissible bounds when it admitted the testimony of the victim's 29–year–old son regarding the death of his little brother (the victim's young son) and his grandfather when he was a child, and his belief that the deaths contributed to the breakup of the marriage of the victim and her husband. Mr. McLaughlin asserts that improper admission of this testimony prejudiced him by encouraging the jury to consider irrelevant, but tragic, life events of the witness and his family and to make its decision based on passion, prejudice, and emotions.

Victim impact evidence is admissible under the United States and Missouri Constitutions. *State v. Forrest*, 183 S.W.3d 218, 225 (Mo. banc 2006); *State v. Roberts*, 948 S.W.2d 577, 604 (Mo. banc 1997). "[J]ust as the defendant is entitled to present evidence in mitigation designed to show that the defendant is a uniquely individual human being, the State is also allowed to present evidence showing each victim's uniqueness as an individual human being." *Payne*, 501 U.S. at 825, 111 S.Ct.

2597. *See also, State v. Deck*, 994 S.W.2d 527, 538 (Mo. banc 1999). "Victim impact evidence violates the constitution only if it 'is so unduly prejudicial that it renders the trial fundamentally unfair.'" *State v. Gill*, 167 S.W.3d 184, 195 (Mo. banc 2005).

In *Forrest*, defendant complained about victim impact testimony concerning the death of the victim's brother and the deteriorating health of another of her brothers. In rejecting Forrest's argument, the Court noted that, "[i]t is not necessary that every piece of victim impact evidence relate to the direct impact of the victim's death on the witness." *Forrest*, 183 S.W.3d at 225, *quoting Gill*, 167 S.W.3d at 196. Here, while it would have been preferable not to admit the evidence, the issue is whether its admission was "so unduly prejudicial that it rendered the trial fundamentally unfair," *Gill*, 167 S.W.3d at 195. The only evidence of such undue prejudice that Mr. McLaughlin cites is the fact that the jury was unable to agree on a verdict. But, there is nothing to connect the jury's deadlock to the admission of this peripheral testimony. This point is denied.

### 2. Excluding Evidence of the Involvement of Another in Disposing of the Body

Mr. McLaughlin asserts that the trial court improperly rejected his offer of proof that his brother was involved in the disposal of the victim's body. Mr. McLaughlin admits that he failed to include this issue in his motion for new trial, and thus that this Court's review is only

---

**10.** The trial court's finding that Mr. McLaughlin intended to make Ms. Guenther unavailable as a witness, both in the burglary and in the abuse cases, and murdered her to procure her unavailability as a witness, is supported by ample evidence. Ms. Guenther's statements prior to her death about defendant's stalking of her, threats to her, and abusive conduct were made during the time that she was attempting to break from the relationship and had filed for orders of protection and

sought protection from the police so that she could safely go from work to home. The police were prosecuting him for burglary of her home less than a month prior to the murder, and during the succeeding month he was seen watching her home. The latest order of protection had been entered the very day of her death, November 20, 2003, and a hearing on the order of protection had been set for the very next day.

for plain error. Rule 29.12; *State v. Glass*, 136 S.W.3d 496, 507 (Mo. banc 2004).

According to Mr. McLaughlin's offer of proof at trial, his brother told another relative that "he had tied [the victim's] legs together and helped drag the body to the riverbank." Mr. McLaughlin admits that this statement was hearsay because he sought to admit it for its truth—that is, to prove his brother really had tied the victim's legs together and dragged the body to the riverbank. *See State v. Barnett*, 980 S.W.2d 297, 306 (Mo. banc 1998). But, he argues it was nonetheless admissible because under the facts of this case its exclusion constituted a violation of the due process clause, citing *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), and *State v. Phillips*, 940 S.W.2d 512 (Mo. banc 1997).

Both cases are distinguishable. In *Phillips*, the refused evidence would have shown that defendant's son was the one that cut up the victim's body and permitted the inference that Phillips had not herself engaged in this depraved conduct. *Phillips*, 940 S.W.2d at 517. *Green* involved a crime for which Green and another man, Moore, were indicted together for rape and murder. At Moore's trial, a witness for the state, Thomas Pasby, testified that Moore had confided that he had killed the victim by shooting her twice while he sent Green to run an errand. *Green*, 442 U.S. at 96, 99 S.Ct. 2150. This not only implicated Moore, but diminished Green's

responsibility in significant respects. Moore was convicted of both crimes and was sentenced to death. When the state later tried Green, it successfully excluded, as hearsay, Pasby's testimony implicating Moore rather than Green. The United States Supreme Court reversed, holding that regardless of whether prohibited by Georgia's hearsay rule, the evidence was "highly relevant to a critical issue in the punishment phase of the trial, [citations omitted] and substantial reasons existed to assume its reliability." *Id.* at 97, 99 S.Ct. 2150.

Here, unlike in either *Green* or *Phillips*, the refused testimony did not exculpate Mr. McLaughlin by showing that Mr. McLaughlin's brother committed the murder. Mr. McLaughlin does not claim that his brother took any part in the murder other than, after the fact, helping him tie the victim's ankles together and dispose of the body, acts to which the state did not give special attention in asking for the death penalty.[11] By contrast, in *Phillips* the prosecutor had focused the jury on the fact that Phillips had dismembered the victim. Cutting up a human corpse constitutes depravity far greater than tying the victim's ankles and helping dispose of the body. The trial court did not plainly err in excluding this evidence.

*G. Penalty Phase Closing that Jurors Must be Soldiers*

 Mr. McLaughlin argues that a new trial should be granted because, he contends, in closing argument the prosecu-

---

**11.** Further, unlike in *Green*, in which, the Supreme Court relied on the fact that the excluded evidence was reliable, 442 U.S. at 97, 99 S.Ct. 2150, in the present case there were not substantial reasons to assume the reliability of Mr. McLaughlin's brother's refused testimony. Portions of his account did not match evidence in the case, such as that Mr. McLaughlin stabbed the victim in the back and cut the victim's neck "from ear to ear and her neck to her pelvic bone." The evidence showed that the only injuries the victim had on her torso were three relatively small stab wounds. Additionally, there were no stab wounds to the victim's back. Finally, Mr. McLaughlin's blue jeans were covered in mud the morning after having disposed of the body at the muddy riverbank. However, his brother was clean the morning after the murder.

tor compared jurors to soldiers and implied the jurors had a duty to impose death, just as soldiers have duties in war they do not enjoy. He admits that no objection was made to this argument, but argues that this Court should find that the trial court plainly erred in failing to *sua sponte* interrupt the argument and take some appropriate action to minimize the prejudice it caused. In support, Mr. McLaughlin cites *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated,* 809 F.2d 700 (11th Cir.1987), and *Weaver v. Bowersox,* 438 F.3d 832 (8th Cir.2006). Neither requires reversal for the argument made here.

The "soldier" argument in *Weaver* is extensive, direct, graphic, and specifically tells the jury that it is its duty to impose the death penalty.[12] *Weaver* stated in disapproving such an analogy, "[w]hen a prosecutor tells a jury that they have a duty to kill and, as in this case, uses a graphic story from a movie to support that duty, the statement should be taken as 'calculated to remove reason and responsibility from the sentencing process.'" 438 F.3d at 840, *quoting, Newlon v. Armontrout,* 885 F.2d 1328, 1338 (8th Cir.1989). The Court concluded that this caused prejudicial error because:

Soldiers have no choice but to kill. Soldiers follow orders when they kill. The responsibility for a particular death lies, therefore, with a commanding officer or the declaration of war itself, and not with a soldier's individual conscience. Furthermore, wartime killing is not a deliberative process, not a considered choice.

Describing jurors as soldiers with a duty eviscerates the concept of discretion afforded to a jury as required by the Eighth Amendment.

*Id.* (citation omitted).

The comments in *Brooks* also extensively compared soldiers and jurors, and were similarly criticized by the Eleventh Circuit, saying, "[t]he principal fault of the analogy is that a capital sentencing jury ... is bound to exercise broad discretion in its determination of a just punishment. This discretion is simply not analogous to the role of a soldier who is ordered to kill the enemy." 762 F.2d at 1412. Like the *Weaver* prosecutor, the *Brooks* prosecutor told the jury it was its duty to impose the death penalty, including saying, "is it asking too much to ask you to go back and vote for the death penalty in this case...." But, *Brooks* ultimately found that the comments did not require a new trial[13] concluding that "there is no reason-

---

**12.** The prosecutor in *Weaver* argued, in part:

I know there's a movie, Patton, and in the movie, George Patton was talking to his troops because the next day they were going to go out in battle and they were scared as young soldiers. And he's explaining to them that I know that some of you are going to get killed and some of you are going to do some killing tomorrow morning. And they all knew that. And he was going to try to encourage them that sometimes you've got to kill and sometimes you've got to risk death because it's right. He said: But tomorrow when you reach over and put your hand in the pile of goo

that a moment before was your best friend's face, you'll know what to do.

....

Sometimes killing is not only fair and justified; it's right. Sometimes it's your duty. There are times when you have to kill in this life and it's the right thing to do.

....

[T]hen you've got to go to the jury room and you've just got to toughen up and do what's right, even though it's going to be tough.

**13.** The prosecutor's closing in *Brooks* included the following, among other arguments:

able probability that the prosecutorial misconduct changed the outcome." *Id.* at 1416. The Court based its decision on the fact that after the prosecutor made the "soldier" argument, the defense counsel effectively responded to the argument and mitigated the effect of the analogy. Further, the jury instructions properly told the jurors their duty. Thus, *Brooks* found, when considered in the context of the entire trial, "it is not our duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair. In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Id.* at 1400, citing, *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

In the present case, the comment by the prosecutor was not as extensive as that criticized in *Weaver* or *Brooks,* and, unlike the prosecutors in both of those cases, the McLaughlin prosecutor did not tell the jury that it was its duty to impose death. Rather, he basically told the jurors that like soldiers, they had a duty, but he then identified that duty as being to hear the evidence and decide on a punishment, stating, "[s]o, ladies and gentlemen, you've heard all the evidence. You've heard both the aggravating and mitigating. It's up to you to decide." He did not tell them it was their duty to decide to kill, in other words, but to reach a decision.

Further, the court's instructions below, like those in *Brooks,* focused the jury's attention on the individualized facts and circumstances of the case and also repeatedly reminded the jury that it was the jury's job to decide the punishment of Mr. McLaughlin. While defense counsel had no opportunity to respond to the analogy, as it was made in rebuttal, as noted, neither did he object to it and so did not preserve it for appeal. This Court thus reviews only for plain error, *see* Rule 29.12, and finds no plain error resulting in manifest injustice from the trial court's failure to *sua sponte* interrupt and strike or otherwise take corrective action concerning the "soldier" comments made by the prosecutor in closing argument.

*H. Failure of Information to Charge Specific Statutory Aggravators*

Mr. McLaughlin asserts that the fact that the information did not itself list the statutory aggravators on which the jury would be instructed violates *Ring,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and *Almendarez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which he says require that the indictment set forth each element of the crime. This Court has repeatedly rejected identical arguments. Nothing in the cited cases requires aggravating circumstances to be listed in the indictment or information, as opposed to in a separate filing. Mr. McLaughlin received timely notice of the statutory aggravators that were alleged to be present. There is no merit to this argument. *See State v. Strong,* 142 S.W.3d 702 (Mo. banc 2004); *State v. Glass,* 136 S.W.3d 496, 520 (Mo. banc 2004).

*I. Independent Proportionality Review*

---

[D]uring my lifetime this country has been in three wars, each war we've taken our young men down to the age of seventeen, we've trained them, we've put guns in their hands, we've taught them how to kill the enemy, and we've sent them overseas, and they have killed other human beings who are enemies of our country, and when they did a good job of killing them, we decorated them and gave them citations, praised them for it.

. . . .

And, if we can send a seventeen-year old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case . . .

██ Finally, although Mr. McLaughlin does not argue on appeal that his sentence is disproportionate to his crime, this Court has an independent obligation to conduct a proportionality review, which is intended to ensure against the "wanton" and "freakish" imposition of the death penalty. *State v. Edwards*, 116 S.W.3d 511, 548 (Mo. banc 2003); *see Kansas v. Marsh*, 548 U.S. 163, 204, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (Souter, J., dissenting). The Missouri statutes require proportionality review in all death penalty cases, directing this Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . .;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Sec. 565.035.3.

This Court has independently reviewed the record and does not find that the sentence of death was imposed under the influence of passion, prejudice or some other arbitrary factor, nor has Mr. McLaughlin identified any such factor to the Court. The Court further finds that the evidence supports the jury's and judge's determinations that the murder was committed with depravity of mind because the crime involved repeated and excessive acts of physical violence and the crime was therefore unreasonably brutal, as found by the jury and by the judge.

The evidence showed that the victim had defensive wounds on her face and arms indicating that she had struggled with her killer; that she had a bruised nose and scratches on her face, neck and wrists that were inflicted while she was still alive; and that she had a hemorrhage under the white of her eye and other indications that she had been strangled before death. She was stabbed a total of seven times.[14] There was also evidence that Mr. McLaughlin raped the victim, at least beginning the rape while she was alive; further, if, as he argues, the rape occurred wholly or partially after death, the crime would be even more depraved.

To determine whether a sentence of death is excessive or disproportionate in comparison to similar cases, this Court notes that in *State v. Rodden*, 728 S.W.2d 212, 222 (Mo. banc 1987), this Court found the death penalty warranted by evidence that the victim had been stabbed 11 times, had defensive wounds, and was conscious during parts of the attack and tried to fend off the blows, and then her body was mutilated by fire after death. Similarly, in *State v. Kinder*, this Court noted numerous cases in which a jury imposed the death penalty where a defendant sexually abused or raped the victim during the perpetration of the offense and affirmed a

14. Defendant argues as a separate point that the definition of "excessive" was too vague to give the jury adequate guidance as to whether this evidence of multiple stab wounds, rape, bruising and other injuries constituted "repeated" or "excessive" brutality. For the reasons noted above, the Court rejects this argument. The depravity of mind language, when combined with an instruction more specifically defining the conduct—here requiring the jury to find that the conduct constituted "repeated and excessive acts of physical abuse"—is not unduly vague. *See, e.g., State v. Johnson*, 207 S.W.3d 24, 46 (Mo. banc 2006), *cert. denied*, — U.S. —, 127 S.Ct. 2880, 167 L.Ed.2d 1156 (2007); *State v. Williams*, 97 S.W.3d 462, 473–74 (Mo. banc 2003). Stalking a woman, and later raping her and stabbing her seven times as she fights for her life constitutes repeated and excessive brutality under any definition of the term.

death sentence where defendant raped and murdered the victim. *Kinder*, 942 S.W.2d at 339–40. *See also, State v. Lingar*, 726 S.W.2d 728 (Mo. banc), *abrogated by State v. Taylor*, 238 S.W.3d 145 (Mo. banc 2007); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981).

For all of these reasons, this Court concludes that the sentence was not disproportionate to the strength of the evidence, the crime or the defendant.

## IV. CONCLUSION

For the reasons set out above, the judgment is affirmed.

PRICE, TEITELMAN, RUSSELL, WOLFF and BRECKENRIDGE, JJ., concur.