In the Missouri Court of Appeals
 Eastern District
 DIVISION TWO

STATE OF MISSOURI, ) ED108511
 )
 Respondent, ) Appeal from the Circuit Court
 ) of Jefferson County
 ) 17JE-CR00250-01
v. )
 ) Honorable Victor J. Melenbrink
CHRISTOPHER B. BUECHTING, )
 ) Filed: July 27, 2021
 Appellant. )

 Christopher B. Buechting (Appellant) appeals from the trial court’s judgment, following

a jury trial, convicting him of second-degree murder, in violation of Section 565.021, RSMo

2016. 1 He was sentenced to twenty-eight years in the Missouri Department of Corrections. We

affirm.

 BACKGROUND

 In September 2019, Appellant was convicted of murder in the second degree for causing

the death of Angela McDonald (Victim). He now appeals, challenging the testimony of Victim’s

friends, Robyn (Robyn) and Brittany (Brittany) Walsh, 2 William Borden (Borden), and Victim’s

daughter, Summer McDonald (Daughter). Prior to trial, Appellant filed a motion in limine

1
 Unless otherwise indicated, all statutory citations are to the RSMo. (2016).
2
 Robyn is Brittany’s mother. To avoid confusion, they are referred to by their first names. No familiarity or
disrespect is intended.
arguing the statements were inadmissible as unreliable hearsay or propensity/character evidence

of prior bad acts or uncharged crimes. The State filed a response to Appellant’s motion,

asserting the evidence of prior domestic abuse was directly relevant to show Appellant’s hostility

toward Victim and motive to injure her. The State also claimed the hearsay statements were

admissible pursuant to the forfeiture by wrongdoing doctrine set forth in Giles v. California, 554

U.S. 353 (2008), and State v. McLaughlin, 265 S.W.3d 257 (Mo. banc 2008). In an August 28,

2019 written order, the trial court granted Appellant’s motion as to Borden, Robyn, and Brittany,

and in part, as to Daughter. However, the court deferred a final determination until the issues

arose at trial, especially in regard to the admissibility of evidence pursuant to the forfeiture by

wrongdoing doctrine.

 At trial and relevant to this appeal, the court held a hearing outside the presence of the

jury after selection but before the jurors were sworn. First, the court accepted the parties’

stipulation that Appellant was a prior felony offender and a persistent misdemeanor offender. 3

Then the court heard arguments on the “legally controversial evidence that the State anticipate[d]

presenting” and Appellant’s motion in limine. The trial court noted it did not have much

procedural guidance and rejected Appellant’s argument that a finding should be made regarding

evidence admitted pursuant to the forfeiture by wrongdoing doctrine. 4 The court ultimately

3
 In addition to the convictions set forth in this stipulation, there was a pending misdemeanor charge for third-degree
assault against Victim in September 2015. Indeed, the State never raised this charge to support the doctrine of
forfeiture by wrongdoing at any time during the trial. However, the record reveals it was raised at the bond
reduction hearing. We take judicial notice of our own court records in this matter, which a court may do, especially
where ascertainment of the truth is of paramount importance or where necessary for the court to engage in a
reasonable exercise of its discretion. Knorp v. Thompson, 175 S.W.2d 889, 894 (Mo. 1943).
4
 Specifically, the trial court remarked, “For better or worse, I don’t have a whole lot of procedural guidelines from
higher authority on how exactly this is supposed to work.” However, in 2021, the Missouri Legislature provided
just such guidance by codifying the forfeiture by wrongdoing doctrine into law. The statute provides that an
otherwise inadmissible statement by a witness is admissible as substantive evidence in a criminal proceeding when
the court finds by a preponderance of evidence that the defendant engaged in or acquiesced to wrongdoing with the
purpose of causing the unavailability of the witness; the wrongdoing in which the defendant engaged in or
acquiesced to has caused or substantially contributed to the unavailability of the witness; the state exercised due

 2
concluded the Victim’s interaction with law enforcement the day before her death, as detailed

herein, was sufficient to invoke Giles and McLaughlin and allowed the State to present the

testimony pursuant to the forfeiture by wrongdoing doctrine. The trial court also indicated it

would rule upon each statement regarding Appellant’s prior bad acts as it was being introduced,

but opined the defense’s evidence of self-harm could open the door to the State’s evidence of

past incidents to provide context.

 In the light most favorable to the verdict, the following evidence was adduced at trial.

Appellant and Victim moved into a trailer together sometime in September 2015. On January

22, 2017, Appellant left the trailer and placed a 9-1-1 call around 4 p.m. He stated it was not an

emergency, but he did not want to be at the trailer if Victim was there because she was jealous

and angry with him. He claimed she threw a brick or rock at him, and purposely hit her head on

the door as he drove away. He adamantly denied the need to meet with authorities to make a

report, even at a different location.

 Jefferson County Sheriff Deputy Andrew Godi (Deputy Godi) responded to Appellant’s

9-1-1 call. When Victim answered the door, Deputy Godi observed she had a dark bruise under

her left chin and bruising under her left eye. She was also holding her left side and complained

of rib pain. Victim told Deputy Godi she had an argument with Appellant earlier that day. She

refused to go to the hospital either with Deputy Godi or by ambulance. However, she did allow

him to contact a women’s shelter to see if she could spend the night, but changed her mind. She

then allowed Deputy Godi to call her friends, Brittany and Robyn, who arrived soon thereafter.

They also noticed Victim’s black eye and bruised chin. Deputy Godi left after Victim agreed to

go home with them. However, Victim again changed her mind and remained at the trailer.

diligence to secure the attendance of the witness, or the witness is unavailable because the defendant caused the
death of the witness; and the witness fails to appear at the proceeding. Section 491.016 (emphasis added).

 3
Brittany testified Victim was scared and Robyn observed that she could not stand up straight.

Victim explained to her friends that Appellant had punched her in the ribs several times and that

she thought they were broken. Appellant objected to this testimony as hearsay, but the State

argued it was admissible pursuant to prior motion arguments. 5 The objection was overruled by

the trial court.

 Brittany also testified that at Victim’s request, she had spent 15 to 20 minutes with her at

the trailer earlier that day after Appellant left but before Deputy Godi arrived. Over Appellant’s

continuing hearsay objection, she stated that Victim was upset with her and told her that if she

“would have showed up earlier, none of this would have happened.” Brittany had noticed – but

did not ask about – Victim’s black eye and bruised chin. She inferred that Victim was talking

about her injuries.

 Appellant testified that when he returned later in the day, he physically removed Victim

from the trailer with his left arm and locked her out. Appellant allowed her back inside after she

was quiet for about three minutes. He said Victim had a bloody nose and blood on her shirt.

That evening Appellant sent a text to his boss, Lindell Lindsay (Lindsay), stating that he was not

coming to work the next day. 6

 Appellant further testified that the next morning, on January 23, 2017, was a “normal

day” but he did not go to work because he stayed up late and was “a little bit concerned about

[Victim]” because she did not look good. Victim was stumbling while walking and fell to her

knees, so he sat her on the couch and went outside. When he returned, he noticed Victim was

“snoring real funny.” He called Lindsay, and said that he “couldn’t arouse [Victim] off the

5
 As discussed supra, the State’s pretrial argument asserted the statements were admissible under the forfeiture by
wrongdoing doctrine, even though it was not specifically referred to in the State’s response to Appellant’s objection.
6
 Lindsay’s testimony further clarified that the text stated that Appellant wasn’t coming to work because there was
“some commotion going on, and he wasn’t going to get much sleep.”

 4
couch.” Lindsay told Appellant to wave something like vinegar near her to see if she responded.

When she did not, Lindsay told Appellant to call an ambulance, which he did at 1:19 p.m.

 Hillsboro Police Officer Gavin Hopler (Officer Hopler) was dispatched to assist the

paramedics who were treating Victim for a head injury. He observed blood spatter on the front

porch and the blood directly in front of the front door partially covered by a door mat. Officer

Hopler testified that he spoke with Appellant, who smelled of alcohol, was slow and hesitant to

answer questions, and whose speech was slurred. Appellant admitted he had an argument with

Victim the previous night and another one earlier that day. He claimed that after he told Victim

he was going to leave her, he heard her violently react by striking her head on the trailer’s door

frame, porch, or window. Appellant told Officer Hopler he did not touch or cause harm to

Victim. He also volunteered that he fled into the woods when officers were dispatched after he

called 9-1-1 the prior day, but did not explain why. Victim was transported to the hospital where

she died the next day.

 On January 24, 2017, shortly after Appellant was informed of Victim’s death, he was

interviewed by Detective Scott Poe (Detective Poe). An audio recording of the interview was

played for the jury. Although Appellant was very upset, Detective Poe testified he understood

the questions and gave coherent answers, but his timeline of events was “jumping all around,” so

he had to frequently stop Appellant for clarification. Appellant claimed that on January 22,

Victim was jealous of Amy Scott and threw a brick at him as he was leaving; he also said she hit

her head on the door. When he returned home that evening, Appellant physically removed

Victim from the trailer with his left arm. He said she banged her head on the door, porch, or

window, and when her nose started bleeding, Appellant helped her inside. Appellant added that

 5
Victim fell and got muddy at a friend’s house a few days prior, but mentioned no other prior

incidents that caused her injuries.

 However, at trial Appellant’s evidence included his testimony denying that he hit,

punched, or kicked Victim and that he did not cause any of the injuries she suffered between

January 20 and 23. Appellant described the source of Victim’s injuries as Victim jumping out of

his truck on January 20 and physically fighting with another woman, Amy Scott, on January 21.

Appellant added that she was angry and violent with him, banged her head on the door frame,

and suffered more injuries when she tried to jump into the back of his truck as he backed out of

the driveway on January 22, the night before she was taken to the hospital. He did admit to

grabbing her left arm, throwing her outside and locking her out of the trailer that same day.

However, Appellant previously failed to mention anything about Victim’s fight with Amy Scott

or her jumping out of a truck a few nights earlier on the way to a friend’s house in his 9-1-1 calls

or to interviewing law enforcement officers. He also failed to disclose Victim’s attempt to stop

Appellant’s truck from leaving the night before she became unconscious, as he claimed at trial.

 Crime scene detective, Nick Schuenemann (Detective Schuenemann), described the

single-wide mobile home with an 8-foot-by-10-foot wooden porch or deck in front and four steps

leading up to it. He testified that, like Officer Hopler, he observed a red “viscous substance,”

described as dried or drying blood, on the steps and on the wooden porch in front of the door,

partially covered by a door mat. Detective Schuenemann later found the same red viscous

substance on the exterior metal threshold and right-hand or locking mechanism side jamb.

Although there was blood spatter, neither Detective Schuenemann nor Detective Poe found the

door, doorway, porch or window of the very thin, older-model mobile home contained any

scratches, dents, demarcations, or remarkable indentations to corroborate Appellant’s story that

 6
Victim had banged her head against the door, doorway, porch or window. Inside, Detective

Schuenemann found the same red substance on a small rug underneath an ottoman in the living

room.

 Robyn and Brittany testified they saw Victim again at the hospital and observed she had a

great deal more bruising on her face and an injury to her nose that she did not have when they

saw her the prior evening. Deputy Godi observed pictures of Victim taken after her death. He

testified Victim did not have the additional swelling and bruising on her face nor the injury to her

nose when he spoke to her on January 22. Corporal Micah Nelson, who investigated and took

photographs at the hospital, testified that Victim had bruising on her right arm and back, left arm,

and left side of her torso. She also had redness, or petechiae, in her eye. Several photographs of

Victim’s injuries were shown to the jury.

 The autopsy revealed that Victim died of a closed head injury and ruled her death a

homicide, meaning it occurred at the hands of another individual. Beginning with an exterior

examination, the autopsy noted recent nasal and rib fractures and a separated right shoulder.

Assistant medical examiner for Jefferson County, Dr. Gershom Norfleet, performed the autopsy

and testified that he observed Victim had two black eyes, which indicated some trauma, a recent

and extensive nose fracture, recent and old rib fractures, as well as bruising and contusions on

her head, arms, legs, and torso. She had scarring on her head. Dr. Norfleet did not know how

the injuries were caused. Based on the “potential story” the head injury occurred due to Victim’s

self-harm, Dr. Norfleet removed Victim’s brain for examination by his supervisor, Dr. Mary

Case, a forensic pathologist, neuropathologist, and the chief medical examiner for Jefferson

County.

 7
 Dr. Case conducted a neuropathological examination of Victim’s brain. She observed

several impacts to the top of Victim’s head and behind both ears. She testified that Victim’s

brain swelled with blood which caused it to die. She stated the injuries were not self-inflicted

and unequivocally testified that banging one’s head against the wall does not create this kind of

injury because one is not able to move one’s head “forcefully enough to create the motion of the

head to tear the bridging veins.” She said if someone was up against a wall and banging their

head against it, she did not believe it would cause death in any way. Instead, she concluded the

subdural hemorrhage was created by “multiple impacts to the head.” Both Dr. Norfleet and Dr.

Case explained Victim’s cause of death was “a very large area of subdural hemorrhage” on the

right side of the brain leading to herniation. Dr. Case said a subdural hemorrhage occurred when

the brain separated from the skull, which “requires a lot of forceful movement of the head.”

When asked whether there were any indications of impacts to the skull, they both explained there

was significant evidence of multiple and separate impacts to the head, specifically to the right

side behind her ear, the frontal area, the very top of the head, and the left temporal area. The

hemorrhage on the right side was acute, meaning very fresh and had recently occurred.

However, the left side showed an older, healed injury that did not contribute to Victim’s death.

 Dr. Norfleet also explained that when a subdural hemorrhage occurs, there is a short

amount of time before the brain cavity fills with blood and the brain swells. He said one could

lose consciousness right away and not regain it. Other symptoms such as a change in blood

pressure, vomiting, and mental status changes may progressively evolve over time, but these still

occur in a matter of hours, not days, and eventually result in death. Dr. Norfleet testified he

believed Victim would have lost consciousness very close in time to sustaining her injuries, not

ten to twelve hours later.

 8
 When Appellant testified at trial, he denied that he caused the injuries described by Dr.

Case and Dr. Norfleet. He insisted Victim was responsible for her own death, possibly from her

self-harm, her jumping into and out of his truck, or her fight with Amy Scott. He also called his

very good friend since grade school, Brian Dering, and boss, Lindsey, as witnesses. Both

testified they had observed Victim beating her head against a wall on different occasions.

 As rebuttal evidence, the State called a friend of Appellant and Victim, Borden, and

Daughter to testify about prior violence they had witnessed between Appellant and Victim.

Appellant renewed his pretrial motion in limine after the close of the defense’s case. The State

responded that the evidence was now admissible because Appellant testified that Victim was

injured when she tried to jump in the back of his truck as he backed out of the driveway. The

court denied Appellant’s motion and allowed the evidence in the State’s rebuttal.

 Borden testified that he had witnessed a violent argument between Appellant and Victim

at their home about two years prior to the September 2019 trial, which would have been just a

few months prior to her death. Approximately five minutes after the argument began, Borden

escaped to the bathroom, then returned to find the Victim on the kitchen floor with her hands and

legs bound by duct tape. Appellant was kicking her in the head. Borden asked Appellant to stop

and he did. Borden left about three or four minutes later.

 Victim’s daughter (Daughter), testified she lived with Appellant and Victim in 2015 and

2016, when she was a freshman in high school. Daughter saw Appellant grab Victim by the

neck and throw her outside. Victim told her not to call the police because “we would get kicked

out of here,” so Daughter went to her room. She heard screaming and crying but was unsure

what was taking place. She testified that she witnessed other episodes of violence that happened

 9
at least twice a month. Every time she tried to call the police, Victim refused to allow her to do

so.

 The jury found Appellant guilty of the charged second-degree murder offense. The court

sentenced Appellant to twenty-eight years in prison. In his motion for a new trial, Appellant

included his claim that the trial court erred in admitting Victim’s statements to Robyn, and in

allowing Borden and Daughter to testify about uncharged acts of abuse against Victim. It did not

raise any claim regarding Brittany’s testimony. This appeal follows.

 DISCUSSION

 Appellant raises four points on appeal. His first two points allege the trial court abused

its discretion in admitting Robyn and Brittany’s hearsay testimony regarding what Victim told

them, in violation of Appellant’s rights to a fair trial and due process under the Sixth and

Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10 and 18(a) of the

Missouri Constitution, in that it did not meet the hearsay exception of forfeiture by wrongdoing

because there was no evidence that the murder was for the purpose of preventing Victim from

testifying against him. Appellant’s third and fourth points allege the trial court abused its

discretion in allowing Borden and Daughter to testify about uncharged acts of abuse by

Appellant against Victim, in violation of his rights to a fair trial, due process, and the right to be

tried only for the offense for which he has been charged under the Sixth and Fourteenth

Amendments to the U.S. Constitution and Article I, Sections 10, 17, and 18(a) of the Missouri

Constitution, in that it was more prejudicial than probative, constituted propensity evidence, and

fell under no exception to the ban on evidence of prior bad acts. We will discuss the first two

points together and then the third and fourth points together.

 10
 Points I and II

 Appellant’s first two points allege the trial court abused its discretion in admitting

Robyn’s and Brittany’s testimony about what Victim told them when they last visited her at her

home. Appellant argues the testimony was hearsay and does not meet the forfeiture by

wrongdoing exception because the State failed to meet its burden to show that Appellant’s

alleged murder of Victim was for the purpose of preventing her from testifying against him.

Appellant alleges the trial court’s error affected the outcome of the trial and deprived him of a

fair trial because this was not a case of overwhelming evidence, Appellant was not able to test

the veracity of Victim’s statements that he caused the injuries she described to Robyn and

Brittany through cross-examination, and constituted propensity evidence. The State argues the

statements were properly admitted under the hearsay exception of forfeiture by wrongdoing, and

the Confrontation Clause protection set forth in Giles v. California, 554 U.S. 353, 356-57 (2008),

does not apply here. Moreover, the State contends Victim’s statement to Brittany was not

hearsay.

 Standard of Review

 A trial court typically has broad discretion in admitting evidence and its ruling will not be

disturbed on appeal absent clear abuse of discretion. State v. Shockley, 410 S.W.3d 179, 195

(Mo. banc 2013); State v. March, 216 S.W.3d 663, 664-65 (Mo. banc 2007) (citing State v.

Wolfe, 13 S.W.3d 248, 258 (Mo. banc 2000)). This Court’s direct appeal review is for prejudice,

not mere error, and the trial court’s decision will be reversed only if the error was sufficiently

prejudicial that it deprived the defendant of a fair trial. State v. McLaughlin, 265 S.W.3d 257,

262 (Mo. banc 2008). “But whether a criminal defendant’s rights were violated under the

Confrontation Clause . . . is a question of law that this Court reviews de novo.” March, 216

 11
S.W.3d at 664-65 (citing State v. Justus, 205 S.W.3d 872, 878 (Mo. banc 2006)). Therefore,

“[d]iscretion is not a complete answer.” State v. Williams, 673 S.W.2d 32, 35 (Mo. banc 1984).

 Analysis

 The Sixth Amendment to the U.S. Constitution states that “[i]n all criminal prosecutions,

the accused shall enjoy the right . . . to be confronted with the witnesses against him.” U.S.

Const. Amend. VI. “Hearsay” is any out-of-court statement that is used to prove the truth of the

matter asserted and that depends on the veracity of the statement for its value. State v.

Sutherland, 939 S.W.2d 373, 376 (Mo. banc 1997). Crawford v. Washington “significantly

changed the Confrontation Clause analysis for hearsay evidence.” March, 216 S.W.3d at 665

(citing Crawford v. Washington, 541 U.S. 36 (2004)). Before, an out-of-court statement could be

admitted over a Confrontation Clause objection if the witness was unavailable to testify and the

statement carried with it an adequate indicia of reliability. Id., citing Crawford, 541 U.S. at 42.

In order to have an “adequate indicia of reliability,” the evidence had to either “fall within a

firmly rooted hearsay exception” or have “particularized guarantees of trustworthiness.” Id. at

40 (internal citations omitted). However, Crawford “divorced the hearsay exceptions from the

Confrontation Clause analysis” and now falling within a hearsay exception does not resolve the

Confrontation Clause issue. March, 216 S.W.3d at 665. “In Crawford v. Washington, the

United States Supreme Court held that the Confrontation Clause demands that all testimonial

evidence be excluded unless the declarant is unavailable to testify and the defendant had a prior

opportunity for cross-examination.” March, 216 S.W.3d at 665, citing Crawford v. Washington,

541 U.S. 36, 68 (2004). However, “the rule of forfeiture by wrongdoing (which we accept)

extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an

 12
alternative means of determining reliability.” Crawford, 541 U.S. at 62 (citing Reynolds v.

United States, 98 U.S. 145, 158-59 (1879)).

 The Supreme Court subsequently decided Giles v. California, 554 U.S. 353 (2008),

which bears a striking resemblance to the facts here. The defendant, Dwayne Giles, was on trial

for murder of his former girlfriend. Id. at 356. Prosecutors sought to introduce statements from

the victim, who, crying as she spoke, told a police officer how her former boyfriend had choked

her, “opened a folding knife,” and “threatened to kill her.” Id. at 381. Three weeks later, the

defendant killed her. Id. At his murder trial, the defendant testified that he had acted in self-

defense and described the victim as jealous, vindictive, aggressive, and violent. Id. To rebut the

defendant’s claim of self-defense and impeach his testimony, the state introduced into evidence

the witness’s earlier un-cross-examined statements. Id. To determine the propriety of the

statements, the Court considered Crawford in analyzing the forfeiture by wrongdoing exception

to the Confrontation Clause and held that the exception requires the state to present evidence that

the defendant engaged in the wrongdoing with intent to prevent the witness from testifying. Id.

at 358-67.

 In particular regard to cases involving domestic violence, the Giles Court specifically

stated:

 Acts of domestic violence often are intended to dissuade a victim from resorting to
 outside help, and include conduct designed to prevent testimony to police officers
 or cooperation in criminal prosecutions. Where such an abusive relationship
 culminates in murder, the evidence may support a finding that the crime expressed
 the intent to isolate the victim and to stop her from reporting abuse to the authorities
 or cooperating with a criminal prosecution—rendering her prior statements
 admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended
 to dissuade the victim from resorting to outside help would be highly relevant to
 this inquiry, as would evidence of ongoing criminal proceedings at which the victim
 would have been expected to testify.

 13
Giles, 554 U.S. at 377. However, Giles was ultimately reversed because the trial court

failed to consider the defendant’s intent as it was deemed irrelevant to the application of

the forfeiture by wrongdoing doctrine. Id. The Court concluded, “This view of the law

was error, but the court is free to consider evidence of the defendant's intent on remand.”

Id.

 The Missouri Supreme Court applied Crawford and Giles in deciding McLaughlin, 265

S.W.3d at 272-73. It explained the forfeiture by wrongdoing exception to the Confrontation

Clause holds that “if a witness is absent by [defendant’s] own wrongful procurement, [defendant]

cannot complain if competent evidence is admitted to supply the place of that which he has kept

away. The Constitution does not guarantee an accused person against the legitimate

consequences of his own wrongful acts.” Id. at 271 (citing Reynolds, 98 U.S. at 158). In

McLaughlin, the defendant was on trial for the first-degree murder of his ex-girlfriend, who had

filed multiple protective orders against him. Id. at 273 n.10. Abuse and burglary criminal

charges were also pending against the defendant. Id. at 272. The Court found the victim’s

statements against the defendant admissible under Giles because there was ample evidence that

he had killed her to prevent her from testifying against him. Id. at 272-73.

 Similarly, in State v. Hosier, the court reviewed the admissibility of a victim’s written

statement in an application for an order of protection, as well as a letter and statements to her

landlord. 454 S.W.3d 883, 896 (Mo. banc 2015). Assuming the statements were inadmissible

under the Confrontation Clause, the Court analyzed them under the forfeiture by wrongdoing

doctrine. Id. at 897. The Court considered Giles in analyzing the confluence of the

Confrontation Clause and the forfeiture by wrongdoing doctrine in the context of domestic

violence, and highlighted how defendants isolate their victims to prevent them from reporting or

 14
cooperating with authorities for prosecution. Id. Based upon evidence that the defendant had

been harassing his victim before her death for seeking judicial intervention, the Hosier Court

found the victim’s statements were admissible because the defendant’s actions were intended to

cause the victim to be unavailable to testify. Id. at 897.

 Here, after careful review of the record we cannot discern that the trial court considered

Appellant’s intent in applying the forfeiture by wrongdoing doctrine as required by Giles.

Moreover, the record is simply devoid of the evidence found in McLaughlin and Hosier, that the

crime was intended to prevent Victim from reporting abuse or crimes against her. Appellant had

called the police himself to contact Victim following their argument on January 22. There was

no evidence that Victim became unconscious on January 23 based on a crime intended to make

her unavailable to testify against Appellant. Even in light of the evidence of ongoing domestic

violence, such as the incident Borden witnessed, Victim’s refusal to report the abuse against her

or allow her daughter to do so, as well as Victim’s refusal to accept help by going to a women’s

shelter or friend’s home for safety, we still find the record lacks the evidence necessary to find

Appellant committed the charged crime with the intent to prevent Victim from reporting him or

testifying against him. 7

 We hesitate to convict the trial court of error with the plethora of evidence supporting the

conclusion that this was an abusive relationship that culminated in murder, as discussed in Giles,

554 U.S. at 377, especially in light of the case pending against Appellant for an alleged assault

7
 In fact, the evidence actually suggests Victim was not yet ready to exit the abusive relationship, much less prepared
to cooperate with authorities in prosecuting her abuser. Just as forewarned by the dissent in Giles, the additional
requirement of intent required to admit testimony of notoriously susceptible victims of domestic violence
imperfectly breaks the court’s implicit promise that “one who obtains the absence of a witness by wrongdoing
forfeits the constitutional right to confrontation” and instead, grants a windfall to the defendant. Giles, 554 U.S. at
406.

 15
on Victim. 8 We recognize that the court could have been cognizant of the pending charge from

the bond hearing conducted in this matter, but the trial record does not reflect the court ever

considered it to determine Appellant’s intent in order to apply the forfeiture by wrongdoing

doctrine to admit the contested testimony. Moreover, we will not add facts or draw inferences

that Appellant intended to prevent Victim from cooperating with authorities in his prosecution.

Thus, we find the trial court erred in applying the forfeiture by wrongdoing doctrine to admit

evidence of Victim’s statements against Appellant.

 However, our direct appellate review is for prejudice, not mere error. McLaughlin, 265

S.W.3d at 262. Therefore, the trial court’s decision will not be reversed unless the error was

sufficiently prejudicial that it deprived the defendant of a fair trial. Id. Despite the trial court’s

error in applying the forfeiture by wrongdoing doctrine to statements made by Victim without

allowing Appellant to confront the deceased Victim, we find the error did not deprive Appellant

of a fair trial. In addition to direct evidence against a defendant, many forms of circumstantial

evidence provide evidence of one’s guilt:

 An accused's affirmative participation in an offense may be reasonably inferred
 from: his presence at the scene of the offense; his association with others involved
 before, during, and after the offense; his conduct before the offense; his conduct
 during the offense, including making no effort to assist the victims; and his conduct
 after the offense, including fleeing from the scene and failing to talk to the police
 relatively soon after the incident.

8
 The Information alleges that on or about September 5, 2015, about the same time she moved into Appellant’s
trailer, he punched Victim in the back of her head during an argument. Although she was hurt, she refused medical
attention. A warrant was served on Appellant more than a year later in November 2016, he was arraigned on
December 12, 2016, and on January 23, 2017, Victim was pronounced dead from a closed head injury by homicide,
according to the autopsy, approximately two weeks before Appellant’s next court date scheduled for February 6,
2017. Following Appellant’s murder conviction, the State dismissed the September 2015 charge. The details and
timeline by which Appellant was served and posted bond, and the pending court date was set could certainly be
indicative of Appellant’s intent to prevent Victim from cooperating with his prosecution and would have
unquestionably allowed the court to apply the forfeiture by wrongdoing exception to admit Victim’s friends’
testimony without error.

 16
State v. Mueller, 568 S.W.3d 62, 71 (Mo. App. S.D. 2019) (internal citations omitted). One’s

participation in a crime may also be inferred from companionship before and after an offense.

Id. at 73.

 We find the evidence of Appellant’s guilt was overwhelming for many reasons. First, the

record contains substantial circumstantial evidence of Appellant’s guilt: his presence at the

trailer at the time Victim became unconscious and his association with her leading up to and after

that time; his admitted disputes with Victim, including when he left the trailer and called 9-1-1;

his admitted act of physically removing Victim from the home with his left arm; and his failure

to assist Victim based on evidence that he talked to his boss about Victim’s condition and delay

in calling an ambulance until late in the day.

 Second, the investigation revealed a lack of physical damage to the trailer. The physical

evidence of blood partially covered by an ottoman and door mat in Appellant’s trailer further

provide circumstantial evidence of an attempt to conceal a crime. Third, Appellant’s initial

failure to mention several salient facts to law enforcement such as Victim’s injuries, her alleged

fight with Amy Scott, or jumping to or from his truck provide substantial evidence that

Appellant’s explanation for Victim’s injuries was not credible. Fourth, the observations made by

Robyn, Brittany, and Detective Godi, about Victim’s obviously worse injuries between when

they visited her at her home and saw her at the hospital, provided sufficient evidence to make

reasonable inferences that a subsequent argument between Victim and Appellant became

physical and Appellant injured Victim, causing her death.

 Finally and most important, Appellant’s own testimony called his explanation of Victim’s

injuries and death into question. Both medical examiners directly contradicted his version of

events leading to Victim’s death as they unequivocally and credibly testified that Victim’s death

 17
could not be caused by self-inflicted head banging, and would have occurred within hours – not

days – of the injury.

 Given the overwhelming evidence against Appellant, we find that eliminating the

contested hearsay statements from the testimony of Robyn and Brittany would not have changed

the result of trial. The record still contained substantial evidence from which a reasonable juror

could conclude Appellant caused Victim’s death. Finding no prejudice, Appellant’s first and

second points are denied. 9

 Points III and IV

 Appellant’s third and fourth points allege the trial court abused its discretion in allowing

Borden and Daughter to testify about uncharged acts of abuse by Appellant against Victim, in

violation of his rights to a fair trial, due process, and the right to be tried only for the offenses for

which he has been charged under the Sixth and Fourteenth Amendments to the U.S. Constitution

and Article I, Sections 10, 17, and 18(a) of the Missouri Constitution. He claims this evidence

was more prejudicial than probative, constituted propensity evidence, and fell under no exception

to the ban on prior bad acts evidence. Appellant argues he did not open the door to this evidence

by introducing prior instances of Victim harming herself as the State argued at trial. Appellant

contends he was unfairly prejudiced by the admission of this evidence because it was not a case

of overwhelming evidence and this evidence carries all the dangers and risks of propensity

evidence. We disagree.

 Standard of Review

 A trial court has broad discretion in assessing the admissibility of evidence, and, absent a

clear abuse of that discretion, its ruling will not be interfered with on appeal. State v. Mozee, 112

9
 Finding no prejudice for admitting hearsay statements, we need not discuss the State’s additional argument that
Brittany’s statement was not offered to prove the truth of the matter asserted and was therefore not hearsay.

 18
S.W.3d 102, 105 (Mo. App. W.D. 2003). That discretion extends to the determination of

admissibility and scope of rebuttal evidence. State v. Floyd, 347 S.W.3d 115, 122 (Mo. App.

E.D. 2011). An abuse of discretion occurs only if the trial court’s decision to admit or exclude

evidence is clearly against the logic of the circumstances then before the court and is so

unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful

consideration. State v. Wood, 580 S.W.3d 566, 574 (Mo. banc 2019).

 Analysis

 A criminal defendant “has ‘the right to be tried only on the offense charged.’” State v.

Ellison, 239 S.W.3d 603, 605 (Mo. banc 2007) (quoting State v. Burns, 978 S.W.2d 759, 760

(Mo. banc 1998)). “The general rule is that evidence of other crimes cannot be used to show that

the defendant has a propensity to commit crime.” State v. Middlemist, 319 S.W.3d 531, 541

(Mo. App. S.D. 2010). “To violate the rule prohibiting evidence of other crimes or misconduct

by the accused, the evidence must show the accused committed, was accused of, was convicted

of, or was definitely associated with, the other crimes or misconduct.” State v. Ponder, 950

S.W.2d 900, 911-12 (Mo. App. S.D. 1997).

 However, evidence of uncharged crimes and bad acts may be admitted to show motive,

intent, absence of mistake or accident, common scheme or plan, or the identity of the person

charged. State v. Pascale, 386 S.W.3d 777, 779 (Mo. App. E.D. 2011). Such evidence is

admissible only when the defendant puts motive, intent, absence of mistake or accident, common

scheme or identity at issue in the case. State v. Tolliver, 101 S.W.3d 313, 315 (Mo. App. E.D.

2003). Evidence of prior bad acts is also admissible to rebut the defendant’s volunteered

assertions from the stand that he has never been guilty of any misconduct. State v. Moore, 352

S.W.3d 392, 402 (Mo. App. E.D. 2011). Moreover, if the defendant raises an issue directly or by

 19
implication, the State can present otherwise inadmissible testimony to counteract the negative

inference the defense has injected into the case. Id. “In other words, a defendant may not

provoke a reply to his own argument and then claim error.” State v. Fassero, 256 S.W.3d 109,

118 (Mo. banc 2008); State v. Stanley, 609 S.W.3d 903, 916 (Mo. App. W.D. 2020). Competent

evidence that explains, counteracts, repels, or disproves evidence offered by a defendant may

also be offered in rebuttal of a defendant’s evidence. Floyd, 347 S.W.3d at 122.

 Otherwise inadmissible evidence also can become admissible because a party has opened

the door to it with a theory presented in opening statement or through testimony. Shockley, 410

at 194. “In addition, evidence of uncharged crimes that are part of the circumstances or sequence

of events surrounding the offense charged may be admissible to present a complete and coherent

picture of the events that transpired.” State v. Sprofera, 372 S.W.3d 17, 19 (Mo. App. W.D.

2012) (citing State v. Primm, 349 S.W.3d 66, 70 (Mo. banc 2011) (internal quotations omitted)).

 In State v. Stanley, the defendant argued the trial court plainly erred when it allowed the

state to redirect the victim about the defendant’s prior acts of domestic violence against her

because it was improper propensity evidence. 609 S.W.3d at 916. The appellate court disagreed,

finding the defendant opened the door to the evidence of prior acts of domestic abuse when the

defense asked the victim on cross-examination whether such prior acts had occurred and she

denied it. Id. The court reasoned:

 At no time during its direct examination of Victim did the State seek to elicit
 testimony of [the defendant’s] violence against Victim. It was only after [the
 defendant] opened the door on cross-examination for such evidence to be elicited
 and after Victim’s denial of domestic violence on redirect examination, that the
 State played Victim’s recorded interview in which she described the prior acts of
 violence committed by [the defendant] against her.”

Id. The court refused to find error. Id.

 20
 Here, like in Stanley, Appellant opened the door to evidence of his prior bad acts when he

himself testified on direct examination:

 Q: . . . At any point on Friday, January 20, 2017, did you physically harm
 [Victim]?
 A: No.
 Q: Did you hit her in the head?
 A: No.
 Q: Did you punch her?
 A: No.
 Q: Did you cause any of those injuries that you described took place on Friday
 the 20th?
 A: No. I did not.
 Q: The next day, the 21st, when [Victim] gets in a fight with Amy Scott, same
 questions: Did you at any point punch [Victim]?
 A: No.
 Q: Did you at any point kick [Victim] on the 21st?
 A: No.
 Q: Did you cause any injuries to [Victim] that day?
 A: No.
 Q: On the 22nd, now Sunday, you mentioned a lot of injuries, did you cause any
 of those injuries?
 A: No, sir. I didn’t.
 Q: Did you punch her in the face?
 A: No.
 Q: Did you strike her on top of the head?
 A: No.
 Q: Did you cause her to hit her head on your door?
 A: No. I didn’t.
 Q: Did you force her to hit her head on your deck?
 A: No. I didn’t.
 Q: Did you do any of that on the 23rd?
 A: No, sir.
 Q: Judge, I have no further questions.

 Even more obvious than just questions on cross-examination in Stanley, Appellant threw

open the door to this rebuttal evidence with his own testimony on direct examination by not only

repeatedly denying culpability in the crime alleged against him, but squarely placing the blame

on Victim for causing her own death. It was after Appellant’s testimony when the State sought

 21
to introduce testimony from Borden and Daughter on rebuttal about Appellant’s prior acts of

violence against Victim, only because she was deceased and could not be questioned.

 Moreover, Appellant’s opening statement commenced with, “It’s impossible to save

somebody who does not want to be saved.” Appellant highlighted Victim’s history of self-harm

throughout trial, beginning with the night they met and ending with the days leading to her death.

Appellant’s counsel outlined expected testimony that Victim got into a fist fight with another

woman the day before Victim was taken to the hospital, and that Victim argued with Appellant

the next day. Appellant argued Victim was injured when she tried to jump into the back of

Appellant’s moving truck and when she jumped out of his moving vehicle. Appellant told the

story of Victim’s history of self-harm through his own voluntary testimony and that of his

friends. He also cross-examined law enforcement during the State’s case about Appellant’s

statements to officers about Victim’s self-harm, asking whether the blood at the scene was

consistent with Appellant’s statements.

 Furthermore, the trial court was very clear at the beginning of the trial so that Appellant

was on notice that the evidence he presented could open the door to this unfavorable testimony.

Appellant renewed his motion in limine after the close of the defense’s case, again attempting to

exclude the testimony of prior allegations of domestic abuse. The State responded that the

evidence was admissible because Appellant testified that Victim was injured when she inflicted

harm upon herself, attempting to jump in the back of his truck as he backed out of the driveway,

banging her own head against the porch or door, jumping out of his moving vehicle, and fighting

with Amy Scott. The court ruled the evidence was admissible in the State’s rebuttal. Borden

and Daughter testified regarding the physical altercations and abuse they witnessed between

Appellant and Victim.

 22
 We find the trial court did not abuse its discretion in admitting the evidence of

Appellant’s prior acts of abuse against Victim during the State’s rebuttal as a means of

counteracting Appellant’s evidence of Victim’s self-harm and his voluntary denial of any

misconduct. After Appellant presented a theory that Victim only wanted to hurt herself and did

not want to be saved, the State’s evidence was proper and necessary to refute this evidence and

show another side of Victim’s physical and mental state, which Victim was unable to provide for

the jury because she was deceased. Moreover, Appellant’s denial of misconduct could be

disproved through the testimony of Borden and Daughter. The circumstances that transpired

leading up to the charged crime were important to present a complete and coherent picture of the

old and new bodily injuries described in the autopsy. The trial court did not err in admitting

Borden and Daughter’s testimony after Appellant opened the door to evidence of Victim’s

typical behavior of self-harm and denied misconduct. Appellant’s third and fourth points are

denied.

 CONCLUSION

 The judgment of the trial court is affirmed.

 ____________________________________
 Lisa P. Page, Judge

Sherri B. Sullivan, C.J. and
Thom C. Clark, II, J., concur.

 23